I was trial counsel for Mr. Bordonici and Mr. Cooper, who was here to argue for the government, was counsel at trial for the government. This is an issue involving twofold issues. One, whether or not there was collusion or a ruse that, in essence, violated the Speed Trial Act, both in time from arrest to indictment and time from arrest to trial. The other is the defendant's burden to show that there was collusion when the government is controlling not only the access of painted material, but is involved in some of the, what I call the smoking gun, showing collusion. It's important to note that in Fairbanks, it's a rather small town, and Beckset, or Bruno Bordonici, was not some isolated, hidden fugitive from INS. He was a character that was known by a considerable number of the 70,000 greater population. He was a misdemeanor of significant stature to the state court system following a full hearing and deportation in 1993. So when one sees in the record that, for reasons unexplained, there was no deportation warrant issued until 1999, and recognizing that his massage parlor that was a front for a misdemeanor prostitution operation was only a mile or so from the state trooper's office, one first wonders what happened during those six years that the warrant only arose in 1999. That leads to recognizing that the indictment says, are you going to tell us? It's it's what I was asking to find out in the INS file. It was what is a rational reason for an INS officer to testify that he just didn't get around to doing the warrant until 1999. There's a significant concern that what he was saying was we were working with the government at that time because they started an investigation of these criminal circumstances in 1998, which is part of the indictment. In asking for the complete file, the INS file, that was significant. Are you working with the government and that you only issued a warrant in 1999 to provide some detainability? The state prosecutor says we're not going to prosecute this man because he's going to be prosecuted by the federal government. The case law is a little bit in conflict with saying that, well, he's going to be deported for acts prior to 1993. But the reality is he wasn't going to be deported at all to suggest that he was on some type of supervision by INS is also a portion of the ruse. So when you hear that testimony that we didn't have any contact with the federal government, it demands additional inquiry or knew she was denied a continuance. Two days before the evidentiary hearing, the prosecutor provided a letter indicating that he had communicated with INS asking them to do whatever is legally possible to hold this man. Well, they proved up a case that resulted in a rather long indictment. The documents were in the courthouse. The continuance was denied. Access to the INS file was denied. Subsequently, the district court said, we'll let you see things following April 16. The documents that were essential was whether or not the INS officer was misleading the court and that he hadn't had winks and nods, phone conversations or other communication, making it clear that poor knew she was going to be held for the government to perfect their indictment. There was other inconsistencies that were clear on review. Most INS holds don't stay in Alaska jails. They go to an INS holding facility in Seattle. That didn't happen. Most INS holds have their fingerprints and photographs taken. That didn't happen here. The only excuse was Yugoslavia wouldn't accept them. If that's the case, apparently anyone that suggests that we're not going to be deported, all we have to do is not provide a birth certificate and we never get deported. It's something at least could be tested by evaluating whether or not the INS officer was acting or speaking. I'm trying to understand you. Your main argument is that their procedures were irregular here. Is that right? No, my main argument is... I'm having trouble understanding because that happens all the time. You don't deport people because of the inability of the home country to receive them. Your Honor, that might be the case. But in this case, I have a letter from Mr. Cooper the day before asking them to assist him and holding him by all legal means possible. That wasn't provided under the subpoena by INS. That was provided by Mr. Cooper and police. I never received anything directly from the INS officer. Well, I thought that the district court, correct me if I'm wrong, I thought the court made available to you the INS file through the government. The court said, well, we'll let you see emails, we'll let you see written correspondence and notes after April 16th and the method will be the prosecutor will screen the file and make them available for you to review and comment. Quite frankly, under the Sixth Amendment, I felt that Mr. Bordener, he had a right to see what he subpoenaed without it being screened by the very man who two days before the hearing produced a letter that implicated him in restricting this man's freedom and deportation for criminal charges. There is some instances of what I might be looking for. The testimony of the INS officer was I was told not to produce the material. I brought it here. Who told him? I contacted my two superiors when I got the letter from Mr. Cooper. Where was any evidence of that? What did they tell him? It was impeachment of an individual who was presented by the government and there was no accessibility to the material. It's possible that that entire INS file and everything that officer said validates everything that the government presents. But because of the inability for Mr. Bordener to have access to that material, controlled by the prosecutor, you'll never know. Really what I'm asking for is that this case be remanded so that due process can be served and he can see if there was collusion as evidenced by that INS file. Did you ask the trial judge to examine that file in camera? I asked the magistrate to ask the prosecutor to go next door and make a copy and attach it to his memorandum with a seal and he refused to do so. Did you ask the magistrate to examine the file in camera? No, I don't remember. It seems like something that came up in the discussion. I asked for it. I know as I briefed, I asked for the continuance. But if they're not going to allow access to the file or allow him to produce the file, attached and magistrate order that it wasn't destroyed. Because you could have. You know, I'd like to say that I did, but I don't remember. A series of things that you'd like to have the magistrate look for. But without any of that information, any helpful information is there. Of course, one of the reasons for subpoena material is to see if it leads to other discoverable material that will basically prove your position here. The burden was on the defendant to show collusion. And I simply argue that we were denied access to the material that could have shown collusion in this case. In closing, I think when you say speedy trial and you artificially break it down by saying, well, this was state arrest. This was INS hold. It's a timing situation that can easily, easily be abused. And there's similar circumstances in the courts where they say if all the INS hold is to develop criminal prosecution, it should be considered a speedy trial. Thank you. May it please the court. I'm Stephen Cooper for the United States. I think this case has to be viewed from the standpoint of the authorities that have similar situations, authorities that have been decided by this court in the past. The one that seems to be an even stronger case for the defendant's position was found not to involve collusion. It would be Ortiz Lopez. It's cited in our brief. It was cited by the Cepeda Luna case decided by this court. And it involved a situation where the immigration had an interest in a person who was in a local jail in the Seattle area. And they decided to go and talk to that person. They had grounds to arrest him for deportation purposes, but they didn't do that arrest yet. They first went to the U.S. Attorney's Office and asked the U.S. Attorney's Office if they'd be interested in a prosecution for illegal reentry. Now, that wasn't the only ground they had, but they asked the U.S. Attorney's Office about that. The U.S. Attorney said, if you question him, question him this way, that way, and the other, and brought out a checklist or gave verbally or in some form a checklist to the immigration agent and said, this is what you should ask him if you talk to him. The immigration officer took that checklist with him, went and visited the person where he was being held in a local jail, and questioned him using the checklist and developed apparently evidence from which a later prosecution for illegal reentry was at least in part made possible. And then arrested him after that, went and saw him again and arrested him for deportation. Now we have the U.S. Attorney's Office not only showing an interest in criminal prosecution of somebody that I.M.S. wants for deportation, but also getting the I.M.S. involved in collecting criminal evidence for that later criminal prosecution. And after that, this person is arrested for deportation, civil deportation by the immigration. Was this an I.M.S. criminal investigator? Criminal section and was it civil section? This was, they call him agent. I would suggest perhaps that means that he was a criminal investigator. I don't know. No, not necessarily. Not necessarily. Then the warrant that he issued, of course, was a civil deportation warrant. So this immigration agent, Essing, visits the defendant, Ortiz Lopez, questions him according to the U.S. Attorney's criminal checklist for illegal reentry, but also comes back later with a civil deportation warrant based on pre-existing grounds, arrests him on that. Did he give him his Miranda warnings? He did. He gave him his Miranda warnings when he spoke to him the very first time. How about the second time? It doesn't record in this court's opinion whether it happened the second time. That was about two weeks or three weeks later that he spoke to him the second time. That time he served the deportation warrant on him. A couple of weeks later, there was an immigration hearing on the deportation issue. They ordered him deported, and the next day the U.S. Attorney files a complaint for illegal reentry, and then he was subsequently indicted on that same charge. And counting the day from the federal complaint to the indictment was all right, but if you go back earlier to when the immigration warrant was served, that would have been more than 30 days, and the defendant had, in that case, a better argument by far than he has here. And the court found it was quite brief. The court simply found that even if, and citing Cepeda Luna for this language, even if the criminal authorities may have played some role in the initial detention, this does not necessarily mandate the application of the Speed Trial Act to civil detentions. I went on to say that the district court found no evidence of actual collusion between federal, criminal, and civil authorities. And finally, the third factor was that the civil arrest was based on unrelated grounds that preexisted by some time. The illegal reentry, the U.S. Attorney was investigating at that time, and the defendant was indicted on. So what we've got is essentially a question, is there actual evidence in the record of collusion? Well, the best evidence is your letter, isn't it? The letter is not, Your Honor. The letter can be argued that way, but the letter never solicits any such thing. The letter uses the opportunity to tell immigration to consider that he's under investigation for very serious criminal charges, something that the public interest really requires if they're going to consider release, but it doesn't go into the details. It solicits their using any lawful options that are appropriate in his case to maintain his availability to face those charges. I would have to acknowledge right off that it would have been more to the purpose for that letter to say exactly what use was intended, such as if the immigration ever comes to the stage where they have to consider possibility of release, whether on bail or supervised release or any other release, consider the fact that he's under investigation for a series of serious federal violations, and it would have been relevant at that point. The INS officer in his testimony stated, and I think it was on page 76 of the transcript, everything we did to deport Borden and Ichi was done in accordance with INS policies and regulations and without taking into consideration that April 16th letter from the U.S. Attorney's Office. Well, I understand that. I'm just saying, I'd say I paid attention to your letter. They might have a pretty good case. They were really done with him, but they were holding him because you asked them to carefully. The facts would have to provide some inference in that regard. The facts run the other way. The facts simply findings were right apart from the letter. We could attach any significance we wish to the letter, but the facts in the record are that the defendant, from the date of the letter now, which is the date that the alleged collusion began, April 16th to April 27th, it took that long for the defendant to produce his birth certificate, and the record is that immediately on the 27th of April, that birth certificate and other documents were faxed to Washington, D.C., which passed them on to the State Department, which passed them on to the United Nations. So from the 27th of April, it was out of the hands of the immigration officer who was supposed to be colluding with the United States. And in addition, that event was preceded by a visit personally by immigration to the defendant in jail on the 16th of April, telling him if he would provide his birth certificate, it would speed up his process. So in other words, quite the opposite of colluding to delay, they're hurrying it up. They're going to the defendant and telling him it will speed up your return to Kosovo if you'll give us your birth certificate. He gets to work on that, and it takes him a week or ten days or more to get it. And when they get it, it's immediately sent to Washington, D.C. Then it goes to the State Department and the United Nations mission, and it was the United Nations mission that comes back about a month and a half later with the authorization letter and the travel document. So the first 11 days are practically all used up by Bordenici himself producing his own birth certificate. Then all the rest of the delay up until June the 14th is the result of the State Department and the United Nations and the investigation that had to have been done in Kosovo essentially to validate the claim that this man needed to be repatriated to that country. And that took up the vast majority of the time, so practically no time is chargeable to immigration. The defendant hasn't yet suggested that the U.S. Attorney colluded with the State Department or with the United Nations mission in Kosovo. I mean, how far are the unsubstantiated speculations going to go? But if you look at what happened in that period of time, the immigration wasn't involved. Most of this time was taken up by the United Nations mission in Kosovo, which came out with their letter in June sometime. And then it was only five days from that date, the 14th of June, when INS got the U.N. letter. Five days from that time, or six, until the date the indictment was filed in this case. And that's the cutoff date for the pre-indictment, 30-day period. So INS in this case is only responsible for approximately six days. The defendant was responsible for the first week or ten days, and the United Nations took up the rest of the time. And there's not a shred of a suggestion that there was collusion up to that level. Let me ask you this. You talk about any lawful options your agency has in this regard. What were those options? This was discussed by immigration officer Carl Zabit, who was in charge of this process. And he indicated that the... I mean, when you wrote this letter, did you have any lawful options in your mind? The letter doesn't go into that. Well, I mean, you must have thought of something. Well, the question essentially would be whether there was the opportunity for any kind of a release, short of actually deporting the person. And that is the very issue at which, the very point at which, the existence of a federal criminal investigation could come into play. And Carl Zabit so testified that the defendant, if it took more than 90 days to accomplish the deportation, he could be considered for supervised release unless he was a danger to the public or a flight risk. And he was asked on page 76 whether that letter was taken into consideration. He said, not at that point, meaning the time at which they were trying to deport him. And then he was asked, the counsel here asked him, was it taken into consideration at some later point? And his answer was, no, it never reached that stage, meaning there was a stage later if they had passed the 90-day point at which his release would have been considered, supervised release pending completion of the deportation process. He said consideration of the letter never reached that, was not taken into consideration because the proceeding never reached that stage. In other words, the indictment intervened before that time. Let me ask, I'm just curious. Couldn't your office have filed a complaint and had an arrest warrant issued and asked the jailer in Seattle to put a hold on him? That could easily have been done, that's true. Why didn't you do that? Could have been. It wasn't. But I mean, why wasn't that done? Why wasn't it done? We wouldn't have this going on. I don't know. I would have to go back and reconstruct all the factors that had a bearing on the prosecuting decisions at that time. But that would essentially, that's a way of making it unnecessary to consider what immigration might be doing. But the United States Attorney's Office wasn't trying to get them to do something that was out of the ordinary in any event. Speaking of the INS, the difficulty here, according to the defendant, is that with due respect to the government and its normal Brady obligation, the government got to decide what in the INS file would actually be disclosed, which is a somewhat unusual procedure because Mr. Zabot said, well, he got your letter and he didn't do anything with it. But we don't know what all the stuff was in his files because all the things he did were documented in his files, to which neither the court nor the defendant actually got full access. So why was that an appropriate order by the district court? The district court's order was entirely appropriate because it gave the defendant, Bordenici, the obligation and the opportunity to determine whether there was some deficiency in the production of anything in that file and said that the district court would hold up this decision until it heard from Mr. Bordenici. The United States complied. First of all, the subpoena was based on a catch-all phrase, the only contested part of the subpoena. It said, any other records, quote, unquote. So any other records was too broad and the magistrate so ruled. During that hearing, defense counsel said, well, at least emails, written correspondence and progress notes relating to the defendant for this period of time that Carl Zabot had testified to. Judge Sedgwick, the district judge, picked up on that and said, all right, the government has ordered to produce that and the defendant is given an opportunity to evaluate that production and report back to the court if any further hearing is necessary. We did that and certified that to the court, itemizing the emails, written correspondence, progress notes, whatever it was, that was additionally produced and the court found that we had complied. The defendant never indicated there was any problem with that production, never requested a further hearing,  and what had happened at the hearing. In other words, the ball was back in the defendant's court to say, is there still a problem or not? Has this been a sufficient fix or hasn't it? And he let that go. Essentially, by that, advised the court and the opposition that there was no problem. That problem was resolved. There was nothing more anybody could have done, the district court or anybody. They essentially asked the defendant in writing, is there a problem? And he did not say there was. So that's essentially a non-issue. And there was additional documentation produced. That's in the supplemental excerpts of page 68. That was the notice of compliance. It itemizes the documents that were produced. The defendant thought there was a problem with that, that the time to say so would have been in the district court, not come up afterwards, say nothing to the district court, and then ask this court to find that there was a problem there. Okay. Anything else? I would just commend to the court's consideration the district court's statement on page 47 of the excerpts of record. This is Judge Sedgwick's ruling that the existing record does not support the argument for collusion. Rather, based on their testimony at the hearing, it would appear that Bordenachie was held in INS custody based on his immigration status, and that goes back for many years prior. That custody continued until June 2001, not in response to Cooper's letter, but because of the difficulty in trying to deport a passportless citizen of a country which was disintegrating into its constituent parts. That was the finding of the district court after careful examination of the record, and I would submit there is absolutely no evidence to overturn that finding. Thank you. All right. Thank you. Just briefly, in closing, in exhibit 48, page 48 of the record exhibits, in the footnote the trial judge says, Federal Rule Criminal Procedure 16 governs discovery in criminal prosecutions. And again, I say that's what it discovers. It's not something that the prosecutor picks and chooses. I did not ask for erroneous or irrelevant documents in June. I was asking for the evidence that Zabat and Ghianti were not telling. All of it was to be told in that file. This INS officer was there at the arrest, and he says the reason I was there to check the alienage of the prostitutes in the building and ask, did you check any of them? No. The INS brought the complete file and was told not to produce it. Everything was screened by the very prosecutor who didn't produce the INS letter he wrote him. He produced his own letters copy in his pleadings the day before the proceedings. No one knows what they're going to find in an INS file. To be asked to ask precisely what's in it, how would we have known to ask for a letter from the prosecutor to INS without being able to see the file? We asked for the complete file. It was denied. We should have access to that as a fundamental due process under criminal procedure 16. Thank you. Federal stand submitted to go to the next case. Well, all good. Versus more. All right. Ready. May it please the court and counsel. My name is Tommy. I'm an attorney here in Anchorage. And I represent this matter. George Smallwood, who is present at the council table today. He lives in Homer, Alaska. I realize that I have no time to present argument. I'd like to reserve two minutes for. And before I begin, I'd like to point out two corrections in my reply brief that I discovered very recently. One is a sentence that begins on page eight and continues on page nine, which states a local rule which impermissibly requires the later amendment of an inter-final judgment without following the amendment procedures of the federal rules and without clearly affording the appealing party an appeal period, which commences upon the date of entry. The amendment judgment is such a rule, I should say, is not such a rule. And on page 17, the last sentence on that page, I state the record discloses why Shady and his family did not use the 20 acre tract. That should, in fact, be why Smallwood and his family did not use the tract. There are two substantive issues present in this appeal. One, which would establish this court's jurisdiction, is whether Mr. Smallwood's appeal was timely filed. The second issue is did the Interior Board of Land Appeals err and deny standing Mr. Smallwood to appeal a decision to convey 27 1⁄2 acres of federal land to Mr. Shady, and did the district court err in affirming the denial of standing? The 27 1⁄2 acres of federal land at issue are in two parcels. One is a 20 acre parcel, which is run adjacent to Mr. Smallwood's property. The other 7 1⁄2 acre parcel is about two-tenths of a mile away. Both of these tracts have been applied for by the appellee Lloyd Shady as parts of his 80 acre federal trade and manufacturing site claim back in the 1950s. But both have been denied conveyance to him by final decisions of the U.S. District Court of Alaska, and then later by this court, the Ninth Circuit Court, and that decision came in early 1981. The effect of the BLM decision of 1997, which Mr. Smallwood sought to appeal, would be to, in effect, reverse the final decision of the Ninth Circuit Court and order that the land be conveyed to Mr. Shady. That decision on the merits has not been fully explored by either of the parties because the standing issue has stood in the way. I'd like to argue first that Mr. Smallwood's appeal was timely filed. The Ninth Circuit issued an order that the timeliness issue be briefed with the issue of standing. In light of this court's decision in a county of imperial case. The trial court in this instance amended its August 2002 final judgment with interleniation of additional material awarding costs and fees to the appellees. This amendment was not sought by Mr. Smallwood under Rule 59. It was not entered by the District Court under Rule 60. It did not benefit Mr. Smallwood. And under the authorities briefed in our opening reply briefs and under the county of imperial case, a party seeking an amendment to a final judgment cannot later benefit from the amendment by having extended time to appeal when the amended final judgment is entered. We've also argued that Local Rule 58.1, which purports to permit the alteration of a final judgment with the later insertion of new substantive material, is not consistent with the formalities required by the federal rules, particularly Rules 59 and 60 of the Federal Rules of Civil Procedure. And therefore, the local rule cannot be sustained unless the amended judgment, which the local rule would appear to permit, is given effect from the date of its amendment and not from the date of entry of the original judgment. The question I have is, you know, we're always in this unfortunate position on these jurisdictional matters related to days on appeal. But in looking at the Supreme Court cases and others, it seems to me you've got final judgment and then you've got these matters that are collateral and not part and parcel of a final judgment. Do you have a case that somehow suggests that the interlineation or the addition of fees and costs somehow changes the character of the final judgment? I was unable to find any case in which the exact document that represents the final judgment was later interlineated with additional material dealing with costs or fees or with any other matter, which I would argue is substance and not merely the correction of a clerical error. However, the fact that apparently the trial court's signature was to do double duty, it was to implement the final judgment, it was also to implement the cost and fee award, which is interlineated, would suggest to me that the later interlineation was to operate with that earlier signature. The question would be, in part, if someone were to appeal only the portion that represented the interlineation, would that appeal be taken from the date of the interlineation or from the date of the original judgment? You could certainly appeal costs. That's timely, because they were added afterwards. But that kind of an appeal wouldn't necessarily bring the whole judgment up, it would just be an appeal of the cost award. But I guess, Your Honor, what I'm asking is, would the appeal of the cost award have to date from the date of the original judgment, because that's the document that it was... No, the original judgment didn't have the cost in it. That's correct, Your Honor, but the judge's signature was not... All I'm saying is that you take kind of a practical view, just as if we come down with a judgment here, you know, you've got two or three weeks to get a cost bill under our rules and so on, and then somebody can get costs. But if you're going to the Supreme Court, you better start counting from our judgment, unless the thing you're going to the Supreme Court about is costs, in which case you can start counting from the cost bill. And I don't think the fact that somehow it gets backdated or anything else would affect the reality of those things. Your Honor, we certainly argue that the final judgment, if it had remained unaltered, would, in our view, have been appealable within 60 days after the date of that final judgment. But I was unable to find any case in which the final judgment was, in effect, changed with additional substantive information or requirements or burdens on the appellee or on the appellant. Is there really any difference between taking a judgment and then writing on it, fees and costs, and taking a judgment and having a separate order that has fees and costs, with respect to appealability of the substantive order? Do you see any distinction between those two? Your Honor, I do simply because the judgment that remains unaltered would be a judgment that was clearly final, that was not subject to any later change. The judgment in which costs and fees or any other matter are interlineated afterwards would have to be examined from the standpoint of whether that interlineation was a material change or was it a correction of a clerical error, and whether it was done at the instance of the party who was later facing the question of the proper date for appeal. I just have trouble... I mean, I understand your argument, but I'm having trouble squaring that with Rule 58 also, which basically, once an appeal is final, which is a substantive, and there's a judgment, then both the Supreme Court cases and Rule 58 seem to indicate that costs, taxing of fees and costs, as a separate collateral matter, doesn't affect the appealability of the judgment. So I guess you're saying this is a special case. I believe Rule 58... I don't have the rules right here with me, but it states that the entry of final judgment shall not be delayed for the taxing of costs. But it said, nor the time for appeal extended in order to tax fees and costs. In this instance, Your Honor, I don't think the time for appeal is extended to take account of the taxing of fees and costs. The fact was that the taxing of fees and costs were then placed on the final judgment itself, and in our view... So let me ask you this. Let's say you get your final judgment. District Court gets busy. A year goes by. You don't have any obligation to file an appeal if the costs and the attorney's fees haven't been determined? Oh, you wouldn't, Your Honor, because you'd have a final judgment that was complete in itself... But how would you know that? Maybe in a year and a half, the judge was going to come back and write it on there. I think that would raise a very serious issue as to whether the final judgment was in fact final. But that's the same question we have here. It's just that we don't have a year and a half. We have less time. We had, what, 20 days, 15 days, yes, Your Honor. I don't believe I have much time left regarding the other portion of the argument. Go ahead and take a minute or two. Thank you, Your Honor. I would just like to point out that the government went to some lengths to examine the procedures under which the Interior Board of Land Appeals reconsiders its decisions, and it quoted a statement from the Federal Register which explained the new adoption at that time, I believe 1987, of the Interior Board of Land Appeals reconsideration options. And that quotation, which appears in page 14 of my reply brief, states that the Interior Board of Land Appeals has taken a fairly strict view of reconsideration because this expectation that the case will be fully developed was justified because almost all of those who petitioned for reconsideration have already had two full opportunities to present their cases to the Department, once before the initial decision-maker and again before the Board. I'd like to point out in this case, Your Honor, that there was no initial opportunity to present the case to the initial decision-maker, the BLM, simply because the decision of the BLM, which was appealed, came out of the blue. And my client, Mr. Smallwood, had submitted a number of documents to BLM which fully substantiated the adverse effects on his property of Mr. Shady's unlawful use of the BLM property, the property that's now proposed to be conveyed to him. So I think it's clear that the IVLA had before it sufficient grounds upon which to determine both that Mr. Smallwood had property directly adjacent to the property in question and two, had a legally cognizable interest which was or would be adversely affected by the BLM decision to convey the land to Mr. Shady because the activities which Mr. Shady had been conducting without authorization for some 15 years would then be legitimized and BLM's conveyance would then place him as the landowner. So I think on those bases, Mr. Smallwood has satisfied the requirements for standing. And you're going into district court under APA as far as... Yes, Your Honor. And is that review a review of the IVLA decision or in the first one or is it just APA review of the IVLA denial of reconsideration? Your Honor, I think the standards in the Ninth Circuit are that both the district court and the Ninth Circuit are to view the case like the IVLA. What I guess I'm saying is, were you reviewing the whole IVLA decisions from beginning to end or were you just reviewing the denial of reconsideration by the IVLA? Your Honor, we appealed on the basis that the denial of reconsideration did not follow the IVLA precedence. However, IVLA in the denial of reconsideration did not clearly differentiate from its initial decision and, in fact, it amplified on findings that it made in its initial decision. So it was quite difficult, I think, to separate procedurally the two decisions. Thank you. I have nothing further at this point. You may please record. I am David Shilton, representing the Secretary for the Interior. With me at council table is our co-appellee, Mr. Lloyd Shady, who's hearing pro se, but I will be presenting the argument today. On the notice of appeal question, we think that merely filling in the amount of costs on the judgment doesn't make any change in the judgment at all, and so the appeal time runs from the judgment. I think that's made clear by a couple of the Federal Rules of Civil Procedure. One is Rule 4.d.1, which provides the cost to a prevailing party in civil cases as a course, which confirms that the determination of the amount of costs doesn't make any change in the judgment. And the other is Rule 58.c.1, which was noted before by Judge McEwen, which provides that entry of judgment may not be delayed nor the time for appeal extended in order to tax costs. So that's simply a reflection of the fact that the order of costs is collateral to the merits of the case, and so it doesn't total the time for filing a notice of appeal. So I think there's no question here that the notice of appeal was not timely from the original judgment. And so the only issue that the notice of appeal could be effective to would be the amount of costs, as Judge Beebe indicated that would be effective as to that, that collateral issue. But I think in Smallwood's reply brief, they dropped that argument that the amount of costs was wrong. So I think this Court does lack jurisdiction over the appeal for that reason. Well, either that or he's conceded an affirmance on costs. Well, right. The rest of the appeal we would lack jurisdiction over. That's right. And then as to the issue of review of the IDLA decision, I think the appropriate review here is of the decision on reconsideration because the arguments that Mr. Smallwood presents here are the arguments made on reconsideration. The two standing arguments that were made originally before the IDLA were the one based on public interest, representing the public interest, and also on the easement, the fact that the allegation that Mr. Chitty's use of the easement was allegedly damaging the property. And as to those two, the IDLA originally said quite correctly that just representing the public interest is not enough and that the easement already existed. It was not affected by the decision to grant the patent, which was being challenged. That was sort of an elbow reaction. You would think an immediate neighbor, however, would have some standing to challenge a grant of the land next to him by the government. All kinds of people come from across the globe and say, well, I'd like to walk across this land, challenge governmental action. You should be the person voting that story. Well, under the IDLA decisions, the person living next door does have a cognizable interest but still has to show adverse effect flowing from the decision that's being challenged. And that was the problem here, is that Mr. Chitty has owned land next to Mr. Smallwood for a long time, way before this, and the allegations of injury stemmed from that existing use and the existing easement, not from the actual decision to grant the additional 20 acres. So it was only on reconsideration that Mr. Smallwood joined the additional arguments about loss of the potential use of that property. And on reconsideration, the IDLA said, no, that's not enough either. But I think the point here is that the scope of review for this court and the decision on reconsideration is extremely narrow and extremely deferential because reconsideration is only granted in extraordinary circumstances. Because Stan, I mean, you know, it may have just been a different way of saying the same thing when he alleged this on reconsideration. It would seem to me that at least at that point, under the rather loose administrative law standing doctrines, that he had at least brought forth enough to allege an adverse interest. Then the question might be, even with that, whether the reconsideration decision should be upheld. But, I mean, your suggestion is that throughout the whole proceeding, he didn't have any standing? Well, it is our position that even if he had raised the allegations that he did on reconsideration initially, that that wouldn't have been enough because even those, I think a fair view of the evidence is that those related also to Mr. Shady's land, usage of his land and rights that he already had, rather than relating to the new grant of a patent. But I think we do need to look at it in the context of that this was a decision on reconsideration and that the burden that Mr. Smallwood had was a lot greater because it was reconsideration. And contrary, I think, to the point you made here, that's the extra burden for reconsideration does depend on there having been two proceedings that he could have presented evidence at. Just having one proceeding, the initial appeal to the IDLA, it is enough. And you've got to make your arguments and present your evidence at that first one. Unless there are questions. Thank you. I would just like to point out that it is not correct that, in fact, in making the conclusion that most of Mr. Smallwood's problems with Mr. Shady stem from his longstanding ownership of other land or of the right-of-way. There are at least two letters in the record, which were directed to the Secretary of the Interior by Mr. Smallwood, which laid out the problems that Mr. Smallwood was having with Mr. Shady's continued use of the property that's in question here, not property that he owned before and not the right-of-way. And the right-of-way separates Mr. Smallwood's property or divides Mr. Smallwood's property from the 20 acres in question. But the destruction of vegetation, the escaping of cattle, dust, noise, etc., were happening on the 20 acres that we're talking about here. And that was very clear in the letters that were in the record before the appeal was taken to IDLA. The problem was that there was no formal proceeding before the IDLA appeal in which Mr. Smallwood could present his arguments other than writing letters to the agency. And, in fact, until the Beyond Decision came out, the agency indicated that it was going to require Mr. Shady to clean up the property, which he'd been using without authorization for 15 years or more, so that the land could be conveyed to the State of Alaska under a State of Alaska land selection. And three weeks or a month after Mr. Smallwood received this information, he received out of the blue the Beyond Decision deciding to convey the land to Mr. Shady. So that was the problem he faced when he appealed to IDLA. He'd made his case regarding the misuse of the 20 acres, but, unfortunately, IDLA did not take that into consideration when it reached its initial decision on standing, and we were unsuccessful to get that changed under reconsideration. I have no further questions. Yeah, I just want to add, you know, it's okay. I'll just add a concept for the government. Does the BLM have any kind of alternate dispute resolution mechanism? I mean, this whole thing where you get two neighbors out in a remote area that have been feuding for all these years, there ought to be some way to settle all this so people can leave peacefully. I'm not aware of any dispute resolution informal mechanism that the BLM has that might apply here. I know that the district court judge expressed the same concern, and it's certainly a legitimate concern. It would be good if there were a way to work this out, but I'm not aware of any particular mechanism that the BLM has for that. Well, I'll just say this. Our court has a very extensive and efficient and well-trained staff of mediators. Do you know that? Oh, absolutely, yes. Do you know that, counsel? Sure. So why don't you make use of their services? I mean, we'll decide the case, but these folks got to live with each other. And, you know, I understand situations where you've got neighbors that don't take care of their property and cause headaches for the rest of people, you know, with dogs and junk and all that. I've been living with that myself for a while. And, you know, I go talk to them and things are pretty good for about a week, and then they revert. But there ought to be some way that these folks can get together. It's not good to live that way. And so why don't you talk to your clients, and maybe we can get one of our mediators to come up here to Anchorage and sit down with you and talk to you all. You know, you can't go living this way. You're both, you know, you're not youngsters anymore. You've got to have a period in your lives where you have a little peace. That's what you went up to Homer for, I'm sure, is to get peace and quiet and not another war. So let us know. I'm serious about this. Thank you. Why don't you just go out in the hall and talk about it, and you can let our clerks know, and we can make the arrangements. I hope. I think we can. Thank you. We'll do it right away before it gets too cold up here, too. Thank you. All right. Matter of staying submitted.
judges: Pregerson, Canby, McKeown